UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW WILLIAMSON,<br>Plaintiff,<br>v.<br>GENENTECH, INC., et al.,<br>Defendants. | Case No. 19-cv-01840-JSC<br><br>**ORDER REMANDING ACTION TO STATE COURT FOR LACK OF SUBJECT MATTER JURISDICTION** |

Andrew Williamson brings this action on behalf of himself and other similarly situated individuals alleging that Genentech Inc.'s sale of prescription drugs in single-dose vials results in waste of medication and violates California's Unfair Competition Law, California Business and Professions Code § 17200 (the "UCL"). Genentech's motion to dismiss the complaint based on federal impossibility preemption, or alternatively, based on California's judicial-abstention doctrine or for failure to state a claim came before the Court for a hearing on November 21, 2019.[1] (Dkt. No. 30.) At the hearing, the Court noted that before addressing Genentech's motion, it must ensure that it has Article III standing to hear this action which was removed from the Superior Court for San Mateo County under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). (Dkt. No. 53.) The parties have since submitted supplemental briefing on this issue. (Dkt. Nos. 59, 62, 63.) Having considered the parties' briefs and having had the benefit of oral argument on November 21, 2019, the Court concludes that it lacks subject matter jurisdiction and REMANDS the action to state court.

//

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 13, 14.)

**SECOND AMENDED COMPLAINT ALLEGATIONS**

Genentech is a biotechnology company based in California. (Second Amended Complaint ("SAC"), Dkt. No. 26 at ¶ 20.[2]) Among Genentech's FDA-approved medications are four that are at issue in this action: Avastin (for treatment of colorectal and other cancers), Rituxan (for treatment of non-Hodgkin's Lymphoma and other conditions), Kadeyla (for treatment of breast cancer), and Xolair (for treatment of asthma). (*Id*. at ¶¶ 23-32.) These medications are all sold in single use vials that are available in the United States in two sizes in the case of Avastin, Rituxan, and Kadeyla, and one size in the case of Xolair. (*Id*. at ¶¶ 24, 27, 30, 33.)

In January of 2016, Plaintiff was treated with Rituxan for Follicular Lymphoma. (*Id*. at ¶ 97.) Over the next five months, he received six 772.5 mg doses of Rituxan. (*Id*. at ¶ 98.) On each occasion, "the hospital used either eight 100 mg vials or one 500 mg vial and three 100 mg vials." (*Id*.) The total charge for this treatment was $34,189.33. (*Id*.) From September 2016 through August 2017, Plaintiff was given a second course of treatment, receiving a single 780 mg dose each time. (*Id*. at ¶ 99.) For this second round of treatment, the hospital used one 500 mg vial and three 100 mg vials. (*Id*.) The charge for the first four administrations of this treatment was $37,464.99 per treatment and the charge for the final treatment was $43,230.99. (*Id*.) In November 2017 and in March 2018, Plaintiff had a third course of treatment where he received doses of 800 mg using one 500 mg vial and three 100 mg vials for a total cost of $43,230.99. (*Id*. at ¶ 100.) For all but the last two treatments, because he received a dose of less than 800 mg and Rituxan was only sold in 100 mg or 500 mg vials, 20-27.5 mg of Rituxan were discarded as waste. (*Id*. at ¶ 101.) For each of these treatments, some or all of the hospital charges were paid by Plaintiff's insurer; however, he paid $231.15 out-of-pocket for his March 2, 2017 treatment. (*Id*. at ¶ 103.)

Based on these allegations, Plaintiff brings a single claim for violation of California's Unfair Competition Law. In particular, Plaintiff alleges as unfair "Genentech's practices of selling drugs in quantities that inherently lead to wasted amounts of medicine, causing substantial injury

---

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

2

1  to Plaintiff and the Class who are forced to purchase large amounts of medications that they do not
2  and cannot use." (Dkt. No. 26 ¶ 167.)

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). CAFA vests federal courts with original jurisdiction over class actions in which: (1) the amount in controversy exceeds $5,000,000; (2) diversity of citizenship exists between at least one plaintiff and one defendant; and (3) the number of plaintiffs in the class is at least one hundred. 28 U.S.C. § 1332(d)(2), (5), (6). "The rule that a removed case in which the plaintiff lacks Article III standing must be remanded to state court under § 1447(c) applies as well to a case removed pursuant to CAFA as to any other type of removed case." *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016); *see also* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").

A defendant seeking removal to federal court "bears the burden of establishing that removal is proper," and the "removal statute is strictly construed against removal jurisdiction." *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009). "The burden of establishing removal jurisdiction, even in CAFA cases, lies with the defendant seeking removal." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011).

## DISCUSSION

"[C]ourts have an 'independent obligation' to police their own subject matter jurisdiction, including the parties' standing." *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 866 (9th Cir. 2019) (citations omitted). To do so, the court must assure itself that "Plaintiffs have alleged an injury in fact, fairly traceable to the defendant's conduct, and likely to be redressed by a favorable judicial decision." *Id.* (citing *Spokeo, Inc., v. Robins*, ⸺ U.S. ⸺, 136 S. Ct. 1540, 1547 (2016)). "Demonstrating injury in fact requires a plaintiff to show []he

3

suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Animal Legal Def. Fund*, 935 F.3d at 866 (quoting *Spokeo*, 136 S. Ct. at 1548). "A 'particularized' injury is one that affects the plaintiff personally, and a 'concrete' injury 'must actually exist.'" *Animal Legal Def. Fund*, 935 F.3d at 866.

The Court raised two primary concerns regarding Article III standing: (1) whether Plaintiff has plausibly alleged facts that support a finding that he has standing to pursue a claim regarding any drug other than Rituxan as there is no allegation that he was ever prescribed or administered Avastin, Kadcyla, or Xolair (the other drugs referenced in the Second Amended Complaint) or is ever likely to be, and (2) whether Plaintiff has alleged facts that show a particularized and concrete injury. The Court was also concerned that Plaintiff had not adequately alleged statutory standing under the UCL which similarly requires a plaintiff to allege that he "has suffered injury in fact and has lost money or property as a result of a violation." *See* Cal. Bus. & Prof. Code § 17535.

The Court's analysis begins with whether Plaintiff has adequately alleged an injury for purposes of Article III standing because if he has not, it is unnecessary to reach the questions of whether he has standing for drugs other than Rituxan and whether he has UCL statutory standing. *See Polo*, 833 F.3d at 1196 (holding that if a court lacks CAFA jurisdiction "[r]emand is the correct remedy because a failure of federal subject-matter jurisdiction means only that the federal courts have no power to adjudicate the matter. State courts are not bound by the constraints of Article III.").

Each party's supplemental briefing argues that Plaintiff has adequately alleged Article III standing. Genentech contends that Plaintiff has standing because he has alleged an economic injury; namely, that he allegedly paid more for his Rituxan prescription than he would have if Genentech had offered the drug in smaller vials. Plaintiff disagrees that he personally paid more than he would have, but nonetheless contends that under the collateral source rule he still has standing. Neither party's position is persuasive.

The only Rituxan payment Plaintiff made was on March 2, 2017. (Dkt. No. 26 at ¶ 103

4

("For the treatment of March 2, 2017, Mr. Williamson paid $231.15 out of his own pocket.").) The Second Amended Complaint does not allege that had Genentech offered smaller vials Plaintiff would have paid less; indeed, in his supplemental briefing Plaintiff contends that his "out-of-pocket expense for his March 2, 2017 treatment would have remained the same even if the amount of wasted medicine had been reduced." (Dkt. No. 59 at 13:91-21.[3]) This dooms Genentech's contention that Plaintiff has alleged an economic loss. In his supplemental briefing, Plaintiff now explains that the payment was not an actual out-of-pocket cost for Rituxan, but instead, represents his payment based on the amount remaining on his annual deductible for his family's health insurance policy. Even without this attorney argument, however, the Second Amended Complaint does not allege facts that support a plausible inference that Plaintiff paid more, no matter how nominal, because of Genentech's alleged waste. Plaintiff's bald statement in his Unfair Competition Count that "the financial injury to Plaintiff" runs into the thousands (Dkt. No. 126 at ¶ 167) is unsupported by any factual allegations and thus is insufficient to support a finding of Article III jurisdiction.

Genentech's insistence that "had Genentech offered Rituxan in a smaller vial size resulting in less 'waste,' Mr. Williamson's alleged economic injury from his March 2, 2017 treatment would have been the difference between what he actually paid for a smaller amount of 'wasted' medicine ($5.33) and what he would have paid for a smaller amount of 'wasted' medicine (something less than $5.33)" (Dkt. No. 62 at 4), is mere unsupported attorney argument. There is no factual allegation which plausibly suggests that Plaintiff would have paid less; indeed, in his supplemental briefing Plaintiffs contends that he would not. Genentech has thus not met its burden to prove Plaintiff's Article III standing.

Genentech's reliance on *Cottrell v. Alcon Labs.*, 874 F.3d 154 (3d Cir. 2017), is misplaced. Unlike Plaintiff here, the *Cottrell* plaintiffs alleged that if the defendants had reduced the size of their eye drops, they "would spend substantially less on their therapy." *Id.* at 160 (internal quotation marks and citation omitted). They then specifically quantified their individual economic

---

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

5

injuries in charts attached to the amended complaint which reflected actual out-of-pocket payments for wasted medication ranging from a few dollars to a few hundred dollars. *Id*. at 160-61. The court found that plaintiffs had adequately alleged an injury in fact because they "claim[ed] economic interests: interests in the money they had to spend on medication that was impossible for them to use. They seek monetary compensation for Defendants' conduct that they allege caused harm to these interests." *Id*. at 165. In contrast, Plaintiff here concedes that he cannot make a similar allegation. (Dkt. No. 63 at 9:5-6.)

The eye drop cases, of which *Cottrell* is one, are also factually inapposite because (1) the allegations were that the drop size was too large which resulted in waste and required the plaintiffs to buy more bottles because they ran out faster, and (2) there was a possible physical injury because the excess medicine could enter the patient's bloodstream which "may increase a patient's risk of experiencing certain harmful systemic side effects." *Id*. at 159; *see also Gustavsen v. Alcon Labs., Inc*., 903 F.3d 1, 5, 7 (1st Cir. 2018) (concluding that plaintiffs had Article III standing where "[t]he injury alleged here takes the form of an out-of-pocket loss of $500 to $1000 per year… Certainly plaintiffs have a legally protected interest in their own money" and noting that the "second alleged impact on patients is physical").[4] No such similar allegations are pled here, nor does Plaintiff's supplemental briefing suggest that they could be pled.

Instead, Plaintiff insists that he can establish Article III standing based on California's collateral source rule; that is, that under the collateral source rule he can recover the entire amount his insurance company paid on his behalf for wasted medicine due to the absence of a smaller vial size. Under the collateral source rule, "if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." *Helfend v. S. Cal. Rapid Transit Dist*., 2 Cal. 3d 1, 6 (1970). Plaintiff seeks to import this rule into the ability to

---

[4] The Seventh Circuit Court of Appeal, in contrast, found no standing in another eye drop case, *Eike v. Allergan, Inc*., 850 F.3d 315, 317 (7th Cir. 2017), where plaintiffs alleged a "'pocketbook' injury of paying what the class contends to be an unnecessarily high price for the defendants' eye drops because of the size of those drops." The court held that "[y]ou cannot sue a company and argue only—'it could do better by us'—which is all they are arguing. In fact, such a suit fails at the threshold, because there is no standing to sue." *Id*. at 318.

6

obtain restitution under the UCL. Restitution under the UCL, however, is "confined to restoration of any interest in money or property, real or personal, which may have been acquired by means of such unfair competition. A restitution order against a defendant thus requires both that ***money or property have been lost by a plaintiff***, on the one hand, and that it have been acquired by a defendant, on the other." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 336 (2011) (emphasis in original).

In *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 964-65 (S.D. Cal. 2016), the court rejected the notion that the plaintiffs—who suffered no out-of-pocket monetary loss—were entitled to restitution based on money paid by insurance companies on their behalf. In reaching this decision, the court discussed California cases on restitution under the UCL. "[T]he purpose of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership or vested interest." *Id*. at 964 (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1149 (2003)). Under California law, "[a] plaintiff has an ownership interest in money or property when the money was once in plaintiff's possession and a defendant has taken it directly from plaintiff." *Lucas*, 212 F. Supp. 3d at 965 (citing *Korea Supply*, 29 Cal.4th at 1149). However, "[w]here a plaintiff has neither an ownership nor vested interest in the money he or she seeks to recover, the plaintiff is not entitled to restitution." *Lucas*, 212 F. Supp. 3d at 965 (citing *Madrid v. Perot Sys. Corp.*, 130 Cal.App.4th 440, 453 (2005)). In light of these California cases, the *Lucas* court found that plaintiff's theory of restitution was unavailing:

> The only right that Plaintiffs have in their insurance benefits is a right to have monies paid on their behalf to a third party. This right is "vested" in the sense that Plaintiffs have paid insurance premiums to guarantee the payment of benefits in accordance with their insurance policies. But that is as far as the interest goes. Plaintiffs' insurance premiums did not guarantee them a future possessory interest in monies paid on their behalf to third parties.

*Lucas*, 212 F. Supp. 3d at 965; *see also Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 955 n.9 (S.D. Cal. 2019) (relying on the statute's plain text requirement of an "ownership interest in the property" to reject application of the collateral source rule to monies paid by plaintiffs' insurers for defendants' products).

While these district court decisions are not binding on this Court, the California appellate

authority on which they rely is binding on the question of the availability of restitution under the UCL. The collateral source rule does not allow Plaintiff to recover as restitution monies his insurance company paid on his behalf in these circumstances because "plaintiff does not have an ownership interest in the money [he] seeks to recover" "it is clear that plaintiff is not seeking the return of money or property that was once in [his] possession" nor does he "have a vested interest" in the money his insurer paid. *Korea Supply*, 29 Cal. 4th at 1149; *see also Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 177 (2000) (explaining that a restitutionary award represents "money that once had been in the possession of the person to whom it [is] to be restored").

The cases Plaintiff relies upon do not persuade the Court otherwise. First, Plaintiff insists that California courts have applied the principles behind the collateral source rule to restitution awards. For this, Plaintiff relies on a series of criminal cases such as *People v. Birkett*, 21 Cal. 4th 226, 229 (1999), which held that crime victims are entitled to the full amount of restitution even where they have recouped some of their losses from their insurance companies. The court reasoned that as with restitution in tort actions, where the collateral source doctrine "precludes the fact or amount of the victim's insurance recovery from reducing his recovery in tort," victims in criminal cases are likewise "entitled to receive from the probationer the full amount of the loss caused by the crime, regardless of whether, in the exercise of prudence, the victim had purchased private insurance that covered some or all of the same losses." *Id*. at 247 n.19; *see also People v. Hove*, 76 Cal. App. 4th 1266 (1999) (holding that the trial court did not err in awarding "the full amount of the economic loss-medical expenses-caused by defendant's criminal conduct, even though the victim had no actual economic losses because his medical expenses were paid by Medicare and/or Medi-Cal benefits [because t]he statute provided that the amount of restitution was not affected by the indemnification or subrogation rights of third parties."); *People v. Duong*, 180 Cal. App. 4th 1533 (2010) (holding that restitution should include the amount of the hospital's claimed lien for victim's treatment as victim restitution); *In re Eric S*., 183 Cal. App. 4th 1560, 1562 (2010) (holding that "the reasoning in *Duong* applies equally to direct victim restitution ordered in wardship cases under Welfare and Institutions Code section 730.6").

8

None of these cases addressed Article III standing. Further, in all of these criminal cases the defendant had actually harmed the victim such that the defendant had taken something from the victim. Here, in contrast, Plaintiff admits that Genentech's conduct did not result in any injury other than the insurance company's payment, and the case law interpreting economic loss under the UCL does not encompass amounts paid by other parties where the plaintiff lacks an ownership interest. *Compare Hove*, 76 Cal. App. 4th at 1272 (holding that restitution was "proper even though the victim had no direct economic losses") *with Korea Supply*, 29 Cal. 4th at 1149 ("The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."). Restitution under the UCL extends to replacing money or property "that defendants took directly from plaintiff" or "money or property in which he or she has a vested interest" such as earned, but unpaid wages. *Korea Supply*, 29 Cal. 4th at 1149.

Plaintiff's reliance on *Parker v. Alexander Marine Co.*, 721 F. App'x 585, 588 (9th Cir. 2017), is also unpersuasive. There, the defendant's conduct caused damage to the plaintiff's boat; thus, there would not have been any Article III standing question. Here, the only possible injury Genentech's conduct could have caused Plaintiff is to cause him to pay more money, but Plaintiff denies that is so. "The term 'injured person' in the context of the collateral source rule connotes one who has sustained personal injuries or property damage at the hands of a tortfeasor." *Kirtland & Packard v. Superior Court*, 59 Cal.App.3d 140, 145 (1976). The rule does not apply where a person cannot plead he suffered the damages for which recovery is sought. *Id*. It is thus unsurprising that no court has used the collateral source rule to find Article III standing. This Court is not persuaded that it should be the first.

Finally, Plaintiff's argument that but for Genentech's conduct, his insurer (Blue Cross) would not have paid for the wasted medicine, returns us to the Court's standing concerns. Plaintiff has not alleged, and cannot allege, that he would have paid any less if a smaller vial of Rituxan had been provided. Accordingly, he did not suffer any injury and thus does not have Article III standing. His lament that such a holding will allow Genentech to receive a windfall is incorrect. The Court is not holding that no one has standing to challenge Genentech's conduct, only that Plaintiff does not have standing. A patient who could actually allege that Genentech's practices

9

caused him to personally pay more money, or the insurance company that paid for the medication, would likely have Article III standing. It is just that Mr. Williamson does not.

The Court therefore concludes that Plaintiff lacks Article III standing to bring his UCL claim in federal court. Having concluded that it lacks subject matter jurisdiction, the Court leaves the question of whether Plaintiff has statutory standing under the UCL for the state court on remand should Mr. Williamson decide to pursue his claim. *See Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016).

## CONCLUSION

For the reasons stated above, the Court lacks subject matter jurisdiction over Plaintiff's claim and REMANDS this action to the San Mateo County Superior Court.

**IT IS SO ORDERED.**

Dated: March 18, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge